# EXHIBIT C

2024 JAN 11 AM 11: 59

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v. 24-CR-_____

EBAY INC.,

Defendant.

DEFERRED PROSECUTION AGREEMENT

Defendant eBay Inc. (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Attorney's Office for the District of Massachusetts ("the U.S. Attorney's Office"), enter into this Deferred Prosecution Agreement (the "Agreement").

Criminal Information and Acceptance of Responsibility

1. The Company acknowledges and agrees that the U.S. Attorney's Office will file the attached six-count criminal Information in the United States District Court for the District of Massachusetts charging the Company with (i) two counts of interstate travel with the intent to harass and intimidate, in violation of Title 18, United States Code, Section 2261A(1)(B); (ii) two counts of using electronic communications services to harass and intimidate, in violation of Title 18, United States Code, Section 2261A(2)(B); (iii) one count of witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3); and (iv) one count of altering documents with the intent to impede, obstruct, and influence the investigation of a matter within the jurisdiction of the Federal Bureau of Investigation, in violation of Title 18, United States Code, Section 1519 ("the Information"). In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161,

and Federal Rule of Criminal Procedure 48(b); (b) agrees to venue of the case in the District of Massachusetts and knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A; (c) knowingly waives any applicable statute of limitations and any legal or procedural defects in the Information; and (d) consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Massachusetts. The U.S. Attorney's Office agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2. The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate. The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed, excluded, or is otherwise inadmissible as evidence in any form. The Company further agrees, as described in Paragraph 24 below, that it shall not, through

present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.

Term of the Agreement

3. This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 11 to 14 below (the "Term"). The Company agrees, however, that, in the event the U.S. Attorney's Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the U.S. Attorney's Office, in its sole discretion, for up to a total additional time period of one year, without prejudice to the U.S. Attorney's Office's right to proceed as provided in Paragraphs 17 to 21 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship or compliance reporting obligations described in Attachment D, for an equivalent period.

Relevant Considerations

4. The U.S. Attorney's Office enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a. the nature, seriousness, and pervasiveness of the offense conduct, as described in the Statement of Facts, including the involvement of senior company employees in a

harassment and intimidation campaign targeting journalists with whose reporting individuals in corporate management took issue;

b. the impact of the offense conduct on the victims and their expressed views regarding this Agreement, *see Justice Manual*, 9-28.1400 and the Attorney General Guidelines for Victim and Witness Assistance;

c. the Company received full credit for its cooperation with the U.S. Attorney's Office's investigation, including: proactively disclosing certain evidence of which the United States was previously unaware; providing information obtained through its internal investigation, which allowed the government to preserve and obtain evidence as part of its own independent investigation; making detailed factual presentations to the U.S. Attorney's Office; voluntarily facilitating interviews of employees; and collecting and producing voluminous relevant documents to the U.S. Attorney's Office;

d. the Company engaged in extensive remedial measures, including: (i) commencing remedial measures based on internal investigations of the misconduct prior to the commencement of the U.S. Attorney's Office investigation; (ii) strengthening its corporate governance by appointing numerous new individuals to senior management and Board of Directors positions; (iii) strengthening its compliance organization by hiring or appointing additional compliance personnel, including the appointment of a Chief Ethics Officer, who reports directly to the Company's General Counsel and the Chair of the Audit Committee of the Board of Directors; (iv) updating its code of conduct, policies, procedures, and internal controls relating to, among other things, safety and security, ethical leadership, the use of company-issued communications resources, management of commercial agents and other third parties, and expense reimbursement; (v) enhancing its internal reporting, investigations and risk assessment

processes; (vi) overhauling its compliance training and communications; and (vii) disciplining certain employees involved in the relevant conduct, including terminating Executive 2, the Company's former Chief Communications Officer;

e. the Company permitted its then-Chief Executive Officer to resign following the offense conduct described in the Statement of Facts, and, in doing so, stated only that "a number of considerations" led the then-CEO and the Company to mutually agree "that a new CEO is best for the Company". The Company did not publicly reprimand the CEO for his actions with respect to the conduct described in the Statement of Facts—including his statements concerning the victims—or for the corporate culture that he oversaw that permitted the offense conduct to occur. Instead, it lauded him in its public announcement of his departure as "a tireless advocate for driving improvement in the business" and paid him contractual severance benefits of more than $40 million;

f. the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program) but, despite its extensive remedial measures described above, the Company to date has not fully implemented or tested its enhanced compliance program, and thus the imposition of an independent compliance monitor for a term of three years, as described more fully below and in Attachment D, is necessary to prevent the recurrence of misconduct;

g. the Company has been the subject of alleged violations of civil law or regulations of the Environmental Protection Agency and the Drug Enforcement Administration, but has no prior criminal history;

h. the unavailability or inadequacy of civil or regulatory enforcement actions;

i. potential collateral consequences, including whether there is disproportionate harm to shareholders, employees, and others not proven personally culpable; and

j. the Company has agreed to continue to cooperate with the U.S. Attorney's Office in any ongoing investigation as described in Paragraph 5 below.

Accordingly, after considering (a) through (j) above, the U.S. Attorney's Office believes that the appropriate resolution in this case is a Deferred Prosecution Agreement with the Company; a criminal monetary penalty in the amount of $3,000,000, the maximum applicable fine permitted by statute upon the Company's conviction of the six counts charged in the Information; and the imposition of a three-year independent compliance monitor.

Future Cooperation and Disclosure Requirements

5. The U.S. Attorney's Office has conducted an extensive investigation of the conduct described in this Agreement and the attached Statement of Facts since September 2019 that has resulted in felony criminal convictions of six Company employees and a Company contractor, and sentences of imprisonment of between 12 and 57 months for four of those defendants. The Company has cooperated fully with the U.S. Attorney's Office in this investigation to date. The Company shall continue to cooperate fully as requested by the U.S. Attorney's Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the U.S. Attorney's Office at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of

the U.S. Attorney's Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company or any of its subsidiaries or affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the U.S. Attorney's Office at any time during the Term. The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the U.S. Attorney's Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such assertion. The Company agrees, in any and all matters related to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the U.S. Attorney's Office, that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a. The Company shall timely and truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the U.S. Attorney's Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the U.S. Attorney's Office, upon request, any document, record, or other tangible evidence about which the U.S. Attorney's Office may inquire of the Company.

b. Upon request of the U.S. Attorney's Office, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the U.S. Attorney's Office the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c. The Company shall use its best efforts to make available for interviews or testimony, as requested by the U.S. Attorney's Office, present or former officers, directors, employees, agents, and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d. With respect to any information, testimony, documents, records, or other tangible evidence provided to the U.S. Attorney's Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, of such materials as the U.S. Attorney's Office, in its sole discretion, shall deem appropriate.

6. In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the criminal laws of the United States by the Company, its officers, directors, employees or agents had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the U.S. Attorney's Office.

Payment of Monetary Penalty

7. The Company agrees to pay a total monetary penalty in the amount of $3,000,000 (the "Total Criminal Penalty"). This is the maximum applicable fine permitted by statute upon the Company's conviction of the six counts charged in the Information. The Company and the U.S. Attorney's Office agree that the Company will pay the United States Treasury $3,000,000, equal to the Total Criminal Penalty, within ten business days of the execution of this Agreement. Nothing in this Agreement shall be deemed an agreement by the U.S. Attorney's Office that the Total Criminal Penalty is the maximum penalty that may be imposed in any future prosecution, and the U.S. Attorney's Office is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the U.S. Attorney's Office agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty. The Company will not use the Total Criminal Penalty to offset any potential civil liability to the victims, and it will not accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

Conditional Release from Liability

8. Subject to Paragraphs 17 to 21, the U.S. Attorney's Office agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company or any of its direct or indirect affiliates, subsidiaries or joint ventures relating to any of the conduct described in the attached Statement of Facts or the criminal Information filed pursuant to

this Agreement. The U.S. Attorney's Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a. This Agreement does not provide any protection against prosecution of any future conduct by the Company.

b. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

Corporate Compliance Program

9. The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of federal criminal laws throughout its operations, including those of its affiliates, subsidiaries, agents, and joint ventures, including, but not limited to, the minimum elements set forth in Attachment C.

10. In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with federal criminal laws. Where necessary and appropriate, the Company agrees to modify its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous compliance program that incorporates relevant internal accounting controls, as well as policies

and procedures designed to effectively detect and deter violations of federal criminal laws. The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C. In assessing the Company's compliance program, the U.S. Attorney's Office, in its sole discretion, may consider the Monitor's certification decision.

Independent Compliance Monitor

11. Promptly after the U.S. Attorney's Office's selection pursuant to Paragraph 13 below, the Company agrees to retain a Monitor for the term specified in Paragraph 14. The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the U.S. Attorney's Office, are set forth in Attachment D, which is incorporated by reference into this Agreement. Within ten (10) business days after the date of execution of this Agreement, the Company shall submit a written proposal identifying three monitor candidates, and, at a minimum, provide the following:

a. a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

b. a written certification by the Company that it will not employ or be affiliated with the monitor for a period of not less than two years from the date of the termination of the monitorship;

c. a written certification by each of the candidates that the candidate is not a current or recent (*i.e.*, within the prior two years) employee, agent, or representative of the Company and holds no interest in, and has no relationship with, the Company, its subsidiaries, affiliates or related entities, or its employees, officers, or directors;

d. a written certification by each of the candidates that the candidate has notified any clients that the candidate represents in a matter involving the U.S. Attorney's Office (or any other Department of Justice component), and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

e. a statement identifying the monitor candidate that is the Company's first, second, and third choice to serve as the Monitor.

12. The monitor candidates or their team members shall have, at a minimum, the following qualifications:

a. a demonstrated expertise with respect to the federal criminal laws, including experience counseling on criminal matters;

b. experience designing and/or reviewing corporate compliance policies, procedures, and internal controls;

c. the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

d. sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

13. The U.S. Attorney's Office retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Company. Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion. If the U.S. Attorney's Office determines, in its sole discretion, that any or all of the three candidates lack the requisite qualifications, it shall notify the Company and request that the Company propose another candidate or candidates within twenty (20) business days. This process shall continue until a Monitor acceptable to both parties is chosen. The U.S. Attorney's Office and the

Company will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement. The U.S. Attorney's Office retains the right to determine that the Monitor should be removed if, in the U.S. Attorney's Office's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 12 above. If the Monitor resigns, is removed, or is otherwise unable to fulfill the Monitor's obligations as set out herein and in Attachment D, the Company shall within twenty (20) business days recommend a pool of three qualified monitor candidates from which the U.S. Attorney's Office will choose a replacement, following the process outlined above.

14. The Monitor's term shall be three years from the date on which the Monitor is retained by the Company, subject to extension as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities.

Deferred Prosecution

15. In consideration of the undertakings agreed to by the Company herein, the U.S. Attorney's Office agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term. To the extent there is

conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of this Agreement.

16. The U.S. Attorney's Office further agrees that if the Company fully complies with all of its obligations under this Agreement, the U.S. Attorney's Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months after the Agreement's expiration, the U.S. Attorney's Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts. If, however, the U.S. Attorney's Office determines during this six-month period that the Company breached the Agreement during the Term, as described in Paragraph 17, the U.S. Attorney's Office's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 19 to 20, remains in full effect.

Breach of the Agreement

17. If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) deliberately provides in connection with this Agreement false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the United States, would be violations of federal criminal law; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether

the U.S. Attorney's Office becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the U.S. Attorney's Office has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the U.S. Attorney's Office in the U.S. District Court for the District of Massachusetts or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the U.S. Attorney's Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the U.S. Attorney's Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the U.S. Attorney's Office is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

18. In the event the U.S. Attorney's Office determines that the Company has breached this Agreement, the U.S. Attorney's Office agrees to provide the Company with written notice of

such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the U.S. Attorney's Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the U.S. Attorney's Office shall consider in determining whether to pursue prosecution of the Company.

19. In the event that the U.S. Attorney's Office determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the U.S. Attorney's Office or to the Court, including the attached Statement of Facts, and any testimony given by or on behalf of the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the U.S. Attorney's Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the U.S. Attorney's Office.

20. The Company acknowledges that the U.S. Attorney's Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company

further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

21. On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the U.S. Attorney's Office in the form of executing the document attached as Attachment E to this Agreement that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the District of Massachusetts.

Sale, Merger, or Other Change in Corporate Form of Company

22. Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations, that is material either to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the U.S. Attorney's Office's ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The

Company shall provide notice to the U.S. Attorney's Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The U.S. Attorney's Office shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the U.S. Attorney's Office may deem it a breach of this Agreement pursuant to Paragraphs 17 to 21 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the U.S. Attorney's Office.

Public Statements by Company

23. Within twenty-four (24) hours of the filing of the Information, the Company will (a) make this Agreement and the Statement of Facts conspicuously available to the public on its website for the duration of this Agreement; and (b) communicate to all Company employees that the Company has entered into this Agreement and make available this Agreement and Statement of Facts to all such employees.

24. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of

Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 17 to 21 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be in the sole discretion of the U.S. Attorney's Office. If the U.S. Attorney's Office determines that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the U.S. Attorney's Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

25. The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the U.S. Attorney's Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the U.S. Attorney's Office and the Company; and (b) whether the U.S. Attorney's Office has any objection to the release.

26. The U.S. Attorney's Office agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the U.S. Attorney's Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

Limitations on Binding Effect of Agreement

27. This Agreement is binding on the Company and the U.S. Attorney's Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the U.S. Attorney's Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company. If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

Notice

28. Any notice to the U.S. Attorney's Office under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to the Chief and Deputy

Chief, Securities, Financial & Cyber Frauds Unit, U.S. Attorney's Office for the District of Massachusetts, One Courthouse Way, Boston, Massachusetts 02210. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to Office of the General Counsel, eBay Inc., 2025 Hamilton Avenue, San Jose, California, 95125. Notice shall be effective upon actual receipt by the U.S. Attorney's Office or the Company.

Complete Agreement

29. This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the U.S. Attorney's Office. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the U.S. Attorney's Office, the attorneys for the Company and a duly authorized representative of the Company.

ACKNOWLEDGMENT ON BEHALF OF EBAY INC.

We, Jamie Iannone, Chief Executive Officer, and Steve Priest, Chief Financial Officer, and the duly authorized representatives of eBay Inc., hereby expressly acknowledge the following: (1) that we have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that we have had an opportunity to discuss this Agreement fully and freely with eBay Inc.'s counsel, Sidley Austin LLP; (3) that eBay Inc. fully and completely understands each and every one of the terms of this Agreement; (4) that eBay Inc. is fully satisfied with the advice and representation provided to it by its counsel, Sidley Austin LLP; (5) that we are authorized, on behalf of eBay Inc., to enter into this Agreement; and (6) that eBay Inc. has signed this Agreement knowingly and voluntarily.

EBAY INC.

Date: January 10, 2024

By: ______________________
JAMIE IANNONE
Chief Executive Officer

Date: January 10, 2024

By: ______________________
STEVE PRIEST
Chief Financial Officer

ACKNOWLEDGMENT BY COUNSEL OF EBAY INC.

I, Jack Pirozzolo, the attorney representing eBay Inc., hereby expressly acknowledge the following: (1) that I have reviewed and discussed this Agreement with my client; (2) that I have explained fully each one of the terms of the Agreement to my client; (3) that I have answered fully each and every question put to me by my client regarding the Agreement; and (4) that I believe my client fully and completely understands all of the Agreement's terms.

January 10, 2024

JACK PIROZZOLO
Sidley Austin LLP
Attorney for eBay Inc.

ON BEHALF OF THE GOVERNMENT

JOSHUA S. LEVY
ACTING UNITED STATES ATTORNEY

Date: January 11, 2024

By: ______________________
Seth B. Kosto
Assistant United States Attorney

## ATTACHMENT A

STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the District of Massachusetts (the "U.S. Attorney's Office") and eBay Inc. ("eBay" or "the Company"). eBay hereby agrees and stipulates that the following information is true and accurate. eBay admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, eBay (including its subsidiaries and majority-owned, operationally controlled affiliates) agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

*eBay*

1. In 2019, eBay was a multinational ecommerce business that operated marketplaces that connected online sellers and their customers. eBay was headquartered in San Jose, California.

2. Executive 1 was eBay's Chief Executive Officer.

3. Executive 2, who joined eBay in February 2019, was the Company's Chief Communications Officer.

4. Executive 3 was eBay's Senior Vice President for Global Operations.

5. Jim Baugh ("Baugh") was eBay's Senior Director of Safety & Security—an eBay division responsible for, in general terms, the physical security and reputation of eBay's employees and facilities worldwide. Baugh reported to Executive 3.

6. David Harville ("Harville"), who reported to Baugh, was eBay's Director of Global Resiliency, a unit focused on ensuring that eBay could continue to operate after business disruptions, such as security threats, political unrest, or natural disasters.

7. Stephanie Popp ("Popp") was eBay's Senior Manager of Global Intelligence and served as Baugh's de facto chief of staff. Before May 2019, Popp managed eBay's Global Intelligence Center ("GIC"), an intelligence and analytics group within the GSR that supported eBay's security operations.

8. Stephanie Stockwell ("Stockwell") was an intelligence analyst in the GIC who became its manager in mid-2019, when eBay promoted Popp.

9. Veronica Zea ("Zea") was an eBay contractor who worked as an intelligence analyst in the GIC.

10. Brian Gilbert ("Gilbert") and Philip Cooke ("Cooke") were retired Santa Clara, California police captains. Each worked at eBay and had responsibilities for, among other things, safety and security at eBay facilities, executive protection, and special events security.

*EcommerceBytes*

11. Ina and David Steiner were a married couple living in Natick, Massachusetts. The Steiners co-founded EcommerceBytes, a website that since 1999 had reported on ecommerce companies, including eBay. Ina Steiner was the editor and reporter for EcommerceBytes; David Steiner served as its publisher.

*Events Preceding the Harassment and Intimidation Campaign*

12. By the spring of 2019, EcommerceBytes' reporting was a source of frustration at eBay. Executives 1, 2, and 3, Baugh, and others at eBay viewed Ina Steiner's reporting adversarially and sometimes used coarse and aggressive language in messages and e-mails about

her and EcommerceBytes.

13. On August 2, 2018, for example, Executive 2's predecessor as Chief Communications Officer wrote to Executive 3 that Executive 1 had "asked us to determine a more holistic strategy to counteract some of [Ina Steiner's] persistent flame throwing." In response, Executive 3 wrote, "We have to win hearts and minds to make it and Ina is more destructive with sellers than you guys give her credit for." Executive 3 then forwarded the email chain to Executive 1, asking to "talk to you a bit about how we get this place fighting and not whining…it's pervasive and destructive. I am ALL IN and we can do this- we just need more fight from more people – including our leaders!"

14. On September 21, 2018, responding to a summary of positive media coverage about an eBay initiative, Executive 3 e-mailed, "We should clap back at Ina – this is a good thing and we should tell them that…i know comms doesn't want us to engage with them, but I want to."

15. On March 1, 2019, upon learning from a communications employee that "Ina has ignored our correction and has not acknowledged [an eBay communications employee's] e-mail at all," Executive 2 responded: "Lame. I want to blow her site up."

16. On March 13, 2019, Executive 1 messaged Executive 2 about a "list of sites for sellers that didn't include Ina today. W[e s]hould find a way to promote it. It's a way to diminish her without saying it. I tweeted it out. Take a look." Executive 2 immediately messaged two eBay employees about the same list: "How can we promote it just to 'eff with her? Totally diminishing for her. I just had [Executive 1] tweet it out. 😉Take a look."

17. On April 10, 2019, reacting to EcommerceBytes' coverage of Executive 1's compensation, Executive 2 messaged Executive 1, "we are going to crush this lady."

18. On April 20, 2019, discussing the *Wall Street Journal*'s coverage of Executive 1, Executive 1 messaged Executive 2, "F[***] them. The journal is next on the list after i[n]a."

*Fidomaster*

19. By the spring of 2019, an anonymous internet user known variously as "Fidomaster", "Dan Davis", and "unsuckebay" (hereinafter "Fidomaster") had also become a source of frustration to Executive 1, Executive 2, Baugh, and others at eBay.

20. On February 22, 2019, for example, a communications employee asked Baugh and Popp to "dig up some intel" on Fidomaster, noting "He's been relentlessly trolling eBay and [Executive 1] on twitter…." At Executive 2's direction, Baugh caused the GIC to prepare a report concerning Fidomaster. The March 2019 report concluded that Fidomaster was an "anonymous twitter user that posts negative content about eBay and its senior leadership." It also asserted that "Fidomaster" communicated with Ina Steiner about issues pertaining to eBay, noting "Steiner and eCommerceBytes are known for publishing negative content about eBay and its executives."

21. In approximately April or May 2019, Baugh met with GIC employees and told them the GIC would be writing an anonymous, handwritten, and threatening letter to Ina Steiner, to get her to stop publishing articles critical of eBay. The letter was never sent.

*Walker's West*

22. On or about May 21, 2019, EcommerceBytes published an article entitled, "*Did You Know eBay Built a Lavish NYC Pub-Style Lounge*?" The article reported that Executive 1 had commissioned the construction of a pub—Walker's West—on eBay's corporate campus, modelling it after a New York City bar. The article contained links to a contractor's website, which featured pictures of the project and a description of the pub.

23. Baugh alerted Executive 3 to the article by email that night, with the subject "Fwd: Ina Steiner – Walker's West."

24. On May 22, 2019, at 9:10 a.m. (PDT), Executive 3 forwarded Baugh's email to Executive 2 and an eBay facilities employee, asking, of the contractor, "Why in the world would they think it's ok to do this and with this level of color???" eBay directed the contractor to take down its website. Executive 3, copying Executive 2 and Baugh, later emailed, "this is ridiculous and has caused serious problems."

25. Within hours, Executive 2 contacted a public relations consultant about the Walker's West article. Executive 2 wrote: "I'm just no longer accepting 'ignore' as a broader strategy and want to fight back. Look forward to talking ASAP to get your assessment of how to do that most [e]ffectively."

26. Thereafter, eBay communications employees sent information to the consultant about the Steiners, including their buying-selling history on eBay and the perspectives of eBay employees who knew them.

27. On or about May 31, 2019, Executive 2 and Executive 3 exchanged messages regarding Ina Steiner and EcommerceBytes. In relevant part:

a. Executive 2 described an EcommerceBytes article discussing Executive 1's presentation to shareholders during eBay's 2019 annual meeting as "[s]hockingly reasonable";

b. Executive 3 referred to Ina Steiner as a "cow";

c. Executive 2 responded, "Her day is coming…"

d. Executive 3 stated, "I can't wait. // Jim Baugh came to me with some thoughts and I told him to stand down and leave it alone."

e. Executive 2 responded, "You are being too kind... tell him to be my advisor on this issue // Some times you just need to make an example out of someone. Justice // We are too nice. She needs to be crushed"

f. Executive 3 responded, "I told [Baugh] I would raise to you and you would let him know if you want him to proceed – but knew you were working on something and didn't want to step into that."

g. Executive 2 responded with a "thumbs up" emoji.

28. On or about June 6, 2019, Baugh tasked the GIC with tracking all of Ina Steiner's and EcommerceBytes' articles and social media posts concerning eBay.

29. On or about June 7, 2019, beneath the letters "FYSA" [For Your Situational Awareness], Executive 2 forwarded to Baugh the emails about the Steiners that eBay had shared with the public relations consultant.

30. On or about June 7, 2019, at Baugh's direction, Gilbert (the retired police captain) traveled to the Boston area to surveil the Steiners.

31. On or about June 8, 2019, Baugh called the Steiners' home in the middle of the night and hung up without speaking to them.

32. On or about June 8, 2019, Gilbert went to the Steiners' home in Natick and scrawled the name "Fidomaster" on their fence.

33. On or about June 17, 2019, the consultant proposed steps to reduce the Steiners' and EcommerceBytes' impact on eBay. The consultant recommended that eBay either (1) create or promote company-friendly content that would drive EcommerceBytes' posts lower in search engine results; or (2) terminate the Steiners' eBay accounts for violations of the company's Terms of Use. Neither proposal was adopted.

34. On or about June 25, 2019, Executive 2 messaged two eBay communications employees about an EcommerceBytes article comparing eBay and another ecommerce company.

After observing that he could not "complain about [Ina Steiner] pointing out fair bumps in our road", Executive 2 stated: "Love it when a secret, we can't speak it out loud plan comes together... 👁", and added, "We always reserve the right to go 0-60 and get crazy on her ass, but this is a huge adjustment the last month. Ever since the Walker's post... 😉".

*The Harassment and Intimidation Campaign*

35. On or about August 1, 2019, the *New York Times* reported that eBay had accused Amazon in a lawsuit of unlawfully poaching eBay sellers to Amazon's online marketplace.

36. That day, at approximately 1:46 p.m. (EDT), Ina Steiner posted an article on EcommerceBytes under the headline, "eBay RICO Lawsuit Meant to Curb Seller Exodus to Amazon?" She wrote: "[Executive 1] has been unable to stop a decline in market sales, but trying to dissuade sellers from turning to Amazon (and trying to get Amazon to stop recruiting sellers) may not be the best tactic."

37. At approximately 2:19 p.m. (EDT), Executive 1 texted Executive 2: "Ina is out with a hot piece on the litigation. If we are ever going to take her down..now is the time."

38. Executive 2 responded at approximately 2:36 p.m. (EDT): "On it."

39. As set forth below, a series of text messages followed between Executive 2 and Baugh, beginning with Executive 2 passing along Executive 1's suggestion that "we … take her down":




40. Executive 2 and Baugh's August 1, 2019 conversation continued by text, with Baugh committing to put in motion a "plan B" and Executive 2 committing to "embrace managing any bad fall out."




41. Baugh continued, stating falsely that Fidomaster—whom he referred to as the "unsuck idiot"—was David Steiner "or [an]other close associate" of Ina Steiner's:




42. Baugh concluded the August 1 exchange with Executive 2 as follows:




43. On or about August 6, 2019, an eBay seller contacted Executive 1 to complain about @unsuckebay, one of the Twitter accounts controlled by Fidomaster. The seller's complaint led Executive 2, Executive 1, Baugh, and eBay's general counsel to communicate about eBay's unsuccessful efforts to have the Twitter account shut down.[1]

44. Executive 2's email concluded: "I am utterly vexed by this! This twitter account [Fidomaster] dominates our social narrative with his CONSTANT obsession with trolling us. It's more than annoying, it's very damaging."

45. The email noted that Fidomaster "and the eCom[m]ercebytes gal"—a reference to Ina Steiner—were "infatuated with eBay" and "have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand—or even build a business." It continued, "This issue

[1]Baugh messaged privately to Executive 1 that Baugh was using an alias Twitter account in an attempt to trick Fidomaster into identifying himself. Baugh stated, "Sorry I have not found him yet, but when I do, it will be fixed".

gives me ulcers, harms employee moral, and trickles into everything about our brand. I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the 'blind eye toward graffiti that turns into mayhem' syndrome and I'm sick about it. Whatever. It. Takes."

46. On or about August 7, 2019, at 4:59 p.m. (PDT), Baugh asked Executive 2 by message, "If I can neutralize Ina's website in two weeks or less, does that work for you?" Within minutes, Executive 2 responded: "I want to see ashes. As long as it takes. Whatever it takes."

47. After receiving Executive 2's text messages and emails about the Steiners, EcommerceBytes, and Fidomaster, Baugh shared them with, among others, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea.

48. Beginning on or about August 5, 2019 and continuing through at least September 6, 2019, Baugh, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea (together "the Individual Defendants") worked together to harass and intimidate the Steiners, and to place them under surveillance with the intent to harass and intimidate them, through repeated and hostile Twitter messages, deliveries of unwanted—and in some instances disturbing—items to the Steiners' home, and travel to Massachusetts to conduct physical surveillance. The Individual Defendants' conduct caused, attempted to cause, and would reasonably have been expected to cause substantial emotional distress to the Steiners.

49. The purposes of the harassment campaign were, among other things, to distract the Steiners from publishing EcommerceBytes, to alter the website's coverage of eBay, and to gather information that the Individual Defendants could use to discredit the Steiners and EcommerceBytes.

50. The Individual Defendants took steps to conceal their harassment campaign from eBay investigators and state and federal authorities, by, among other things, using non-eBay electronic communications platforms, billing expenses related to the campaign to an outside contractor, monitoring law enforcement communications, forging records, lying to investigators, and destroying evidence.

51. Among the manner and means by which Individual Defendants carried out the harassment campaign were the following:

a. Creating Twitter accounts in false names that featured ominous profile photos.

b. Using these Twitter accounts to send threatening private direct messages ("DMs") to Ina Steiner about her, David Steiner, and EcommerceBytes.

c. Publicly posting the Steiners' home address on Twitter, while suggesting in threatening messages that eBay sellers who were angry about EcommcerceBytes' coverage were going to visit the Steiners' home.

d. Ordering unwanted and scary items and services to the Steiners' home, and ordering items intended to embarrass the Steiners to their neighbors' addresses.

e. Posting online advertisements for fictitious events at the Steiners' home, including sexual encounters, to encourage strangers to visit them there.

f. Traveling to Natick to install a GPS device on the Steiners' car, and to surveil the Steiners in their home and in their community.

g. Monitoring law enforcement communications to avoid detection.

h. Establishing false cover stories for the surveillance trip, including that the coconspirators were investigating the Steiners for threatening Executive 1.

i. Continuing surveillance, even after the Steiners had detected it, with the purpose of intimidating them.

j. Disguising their roles in the conspiracy by harassing and intimidating the Steiners using prepaid cell phones and laptops, VPN services, overseas email accounts, and prepaid debit cards purchased with cash.

k. Offering the Steiners assistance with the very harassment they were committing, to earn the Steiners' good will ("the White Knight Strategy").

l. Making false and misleading statements to NPD personnel who were investigating the threatening communications, harassing deliveries, and surveillance of the Steiners.

m. Communicating by WhatsApp regarding how to harass the Steiners and how to respond to the NPD investigation.

n. Creating a "dossier" of their own threats to the Steiners, which they planned to show to the NPD as proof that Zea and Harville were in Massachusetts investigating the harassment of the Steiners (purportedly by third parties).

o. Exchanging ideas about how best to thwart the NPD investigation, including creating false suspects, continuing the harassing deliveries, fabricating cover stories, and intervening with any San Jose area police that the NPD contacted to further its investigation.

p. Lying to eBay investigators who were responding to NPD requests for eBay's assistance.

q. Exchanging ideas about how best to thwart eBay's internal investigation.

r. Deleting the contents of computers, cell phones, and social media accounts that evidenced the harassment and intimidation campaign and the defendants' and their coconspirators' efforts to obstruct the NPD investigation.

<u>Actions in Furtherance of the Harassment and Intimidation Campaign</u>

52. From on or about August 5, 2019 through at least September 6, 2019, the Individual Defendants took the following steps, among others, as part of the harassment and intimidation campaign:

a. On or about August 6, 2019, Baugh, Gilbert, Cooke, and Popp met at eBay headquarters to plan the White Knight Strategy.

b. On or about August 6, 2019, Baugh, Popp, Stockwell, Zea, and other members of the GIC met at eBay headquarters to plan the delivery to the Steiners' home of unwanted and disturbing items to distract the Steiners from publishing the Newsletter.

c. On or about August 6, 2019, Stockwell purchased a laptop computer at a Best Buy store in San Jose, California for use in the harassment and intimidation campaign.

d. On or about August 6, 2019, Popp created a Twitter account in the name of "@Tui_Elei" that used a picture of a skeleton mask as a profile picture.

e. On or about August 7, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "[Ina]…whats your prblem w/ ebay? You know thats how we pay rent..."
- "HELLO!!!!!!!"

f. On or about August 8, 2019, Zea and a GIC analyst purchased prepaid debit cards with cash at a Santa Clara, California supermarket for use in ordering harassing deliveries to be sent to Ina and David Steiner.

g. On or about August 9, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "WTF…whats it goin to take for u to answer me??"
- "I guess im goin to have to get ur attention another way bitch…"
- "U dont have the balls to talk to me?? Stop hiding behind ur computer screen u fuckin cunt!!!"

h. On or about August 9, 2019, Stockwell used an anonymous email account to order live spiders and fly larvae for delivery to the Steiners' home.

i. On or about August 9, 2019, one or more of the Individual Defendants ordered a subscription for pornographic magazines in the name of David Steiner to be sent to the Steiners' neighbors.

j. On or about August 9, 2019, one or more of the Individual Defendants attempted to order a pig fetus for delivery to the Steiners' home.

k. On or about August 10, 2019, one or more of the Individual Defendants ordered a Halloween Pig Mask for delivery to the Steiners' home.

l. On or about August 10, 2019, Popp sent the following DM from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "DO I HAVE UR ATTENTION NOW????"

m. On or about August 10, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "Ur fat fuck pussy husband [David Steiner's first name] needs to put u in line cunt"

- "after he takes the plugs out of his asshole… fuckin pussies!!!"

n. On or about August 11, 2019, Baugh directed Harville to travel with him to Boston for an "op" targeting Ina Steiner and her website (*i.e.*, EcommerceBytes).

o. On or about August 11, 2019, Baugh sent Harville the following text message: "I won't send the bosses texts, but I've been ordered to find and destroy." Harville replied, "Copy. Totally black[.] I'm deleting this now."

p. On or about August 12, 2019, Baugh sent Popp, Stockwell, Zea, and other GIC analysts the following WhatsApp message: "Starting now through Tuesday night double our effort on everything. Spam, house deliveries, etc. I don't want anything delivered on Thursday, so the cut off should be Wednesday night – wake them up with a limo driver or something and then everything goes cold Thursday morning. … Take down all Craigslist posts late Wednesday night. Stop spam late Wednesday night etc."

q. On or about August 12, 2019, one or more of the Individual Defendants sent a book titled "Grief Diaries: Surviving Loss of a Spouse" to the Steiners' home.

r. On or about August 12, 2019, Popp used the @Tui_Elei Twitter account to post publicly to Ina Steiner's Twitter account: "Ina… wats ur problem with ebay??..."

s. On or about August 12, 2019, Popp used the @Tui_Elei Twitter account to post publicly to Ina Steiner's Twitter account: "many familys including mine make money 2 pay 4 food cloths and rent by selling on ebay…UR stupid idiot comments r pushin buyers away from ebay and hurtin familys!! STOP IT NOW!!"

t. On or about August 13, 2019, one or more of the Individual Defendants used a prepaid debit card to order a funeral wreath for delivery to the Steiners' home.

u. On or about August 14, 2019, one or more of the Individual Defendants ordered live cockroaches for delivery to the Steiners' home.

v. On or about August 14, 2019, Popp used the @Tui_Elei Twitter account to post a public message to Ina Steiner's Twitter account: "[First name of Ina Steiner] wen u hurt our bizness u hurt our familys…Ppl will do ANYTHING 2 protect family!!!!"

w. On or about August 14, 2019, Baugh, Harville, Zea, Gilbert, and Popp met to discuss a trip to Natick, Massachusetts to install a GPS tracking device on the Steiners' car and to surveil the Steiners. At the meeting, Baugh instructed Zea to

stop harassing deliveries that would interfere with the surveillance operation.

x. On or about August 14, 2019, Zea attempted to register herself and Harville for a software development conference in Boston as false cover for the surveillance trip.

y. On or about August 15, 2019, Harville used his eBay-issued phone to visit a website that could be used to monitor the "Natick Police and Fire Live Audio Feed."

z. On or about August 15, 2019, Baugh, Harville, and Zea flew from California to Boston, Massachusetts.

aa. On or about August 15, 2019, Stockwell sent a text message to Harville providing the license plate numbers for the Steiners' cars.

bb. On or about August 15, 2019, Baugh, Harville, and Zea drove to the Steiners' home in Natick and attempted unsuccessfully to install a GPS tracking device on the Steiners' car, which was locked in the Steiners' garage.

cc. On or about August 15, 2019, Baugh, Harville, Popp, and Zea dialed in to a conference line to communicate during the surveillance operation and to monitor the NPD dispatch.

dd. On or about August 15, 2019, Baugh directed Stockwell by WhatsApp message to prepare an eBay "Person of Interest" report ("POI Report") that listed the Steiners as eBay's top POIs. Baugh wrote, "In the narrative I need you to write that they have made direct threats to ebay, [eBay's CEO], and our employees (make it up)."

ee. On or about August 16, 2019, Harville purchased tools at a Boston hardware store for the purpose of breaking into the Steiners' locked garage.

ff. On or about August 16, 2019, Baugh, Harville, and Zea returned to Natick in a rented Dodge Caravan to surveil the Steiners and drove past their home repeatedly.

gg. On or about August 16, 2019, Harville dialed in to the surveillance team's conference line.

hh. On or about August 16, 2019, Baugh, Harville, and Zea followed David Steiner as he drove around Natick.

ii. On or about August 16, 2019, believing that David Steiner had spotted the surveillance, Baugh returned the Dodge Caravan to the rental car agency.

jj. On or about August 16, 2019, after the failed surveillance, Baugh directed that harassing deliveries to the Steiners resume.

kk. On or about August 17, 2019, at 3:08 a.m. (EDT), Stockwell researched Boston-area 24-hour drain repair services on the internet for the purpose of sending a repairman to the Steiners' home in the middle of the night.

ll. On or about August 17, 2019, one or more of the Individual Defendants ordered pizza to be delivered to the Steiners' home at 4:30 a.m., for payment upon delivery.

mm. On or about August 17, 2019, Harville returned to California, and Popp traveled to Boston to replace him on the surveillance team.

nn. On or about August 18, 2019, Popp replied to a public tweet on Ina Steiner's Twitter account using the @Tui_Elei account and stated: "Dis ur address???" The message was followed by information about Ina Steiner, accurately stating her name, age, address, and telephone number.

oo. On or about August 18, 2019, Popp sent the following DM from the @Tui_Elei Twitter account to Ina Steiner's Twitter account: "U get my gifts cunt!!??"

pp. On or about August 18, 2019, one or more of the Individual Defendants posted an advertisement on Craigslist claiming to be a married couple seeking a sexual partner or partners, and providing the Steiners' home address.

qq. On or about August 18, 2019, Baugh, Popp, and Zea followed David Steiner as he drove in Natick.

rr. On or about August 20, 2019, Baugh sent a text message to Popp, Gilbert, and Cooke that the Individual Defendants had "burned" two surveillance cars and that either the Steiners or the NPD were "seeing ghosts right now."

ss. On or about August 20, 2019, Baugh forwarded to Gilbert the POI Report falsely indicating that the Steiners were security threats to eBay. In a WhatsApp message to Gilbert, Cooke, and Popp, Baugh stated: "Just sent poi doc with [the Steiners] included. I had GIC send this to me last week in case we got stopped..that way would at least have something to show to PD"

tt. On or about August 20, 2019, after Twitter suspended the @Tui_Elei account for posting the Steiners' home address, Popp created a new Twitter account, @Elei_Tui, for use in harassing the Steiners.

uu. On or about August 20, 2019, Popp also created two other Twitter accounts, including one that used the name of a prominent eBay seller.

vv. On or about August 21, 2019, Zea and Baugh made false statements to an NPD detective who came to the surveillance team's hotel to investigate Zea and Harville's connection to the cyberstalking campaign.

ww. On or about August 21, 2019, at approximately 9:36 a.m. (EDT), Baugh sent the following text message to Popp, Gilbert, and Cooke: "Natick detective is in lobby looking for [Zea]. I've taken her away from hotel headed to airport…Detective called her cell. I answered just now as her husband and played dumb."

xx. On or about August 21, 2019, at approximately 9:39 a.m. (EDT), Gilbert proposed to Baugh, Cooke, and Popp bringing "dossiers" on the Steiners to the NPD: "Definitely want to make them look crazy."

yy. On or about August 21, 2019, between approximately 10:30 a.m. and 12:00 p.m. (EDT), Popp sent more threatening tweets to and about Ina Steiner and the Newsletter ("the Concerning Tweets"). Popp used the three Twitter accounts that she had created the night before to have a public "conversation" on Twitter, asking over one account what Ina Steiner's address was, and responding from the other "guest I hav to pay Ina a visit."

zz. On or about August 21, 2019, minutes after writing the Concerning Tweets, Popp forwarded images of the Concerning Tweets to Baugh and Gilbert, writing falsely that Ina Steiner was "really bringing out some angry Twitter users"

aaa. On or about August 21, 2019, at approximately 12:34 p.m. (EDT), Baugh forwarded the Concerning Tweets to Harville.

bbb. On or about August 21, 2019, at approximately 2:30 p.m. (EDT), executing the White Knight Strategy, Gilbert called the Steiners, identified himself as an eBay employee, and offered eBay's assistance.

ccc. After the call, Gilbert messaged Baugh, Popp, and Cooke that the Steiners were "totally rattled and immediately referred [Gilbert] to Natick PD".

ddd. Thereafter, still on August 21, 2019, Gilbert spoke, text messaged, and emailed with an NPD detective who was handling the investigation into the harassment of the Steiners. Gilbert falsely claimed not to know Zea or Harville and falsely stated that he had to travel to Toronto and New York but would instead attempt to come to Boston to meet with the NPD.

eee. On or about August 21, 2019, after learning that the NPD was investigating the use of a prepaid debit card to purchase pizzas for delivery to the Steiners, Baugh and Popp directed Stockwell to prepare a list of eBay "Persons of Interest" in the

San Francisco Bay Area that could be used (as part of Gilbert's "dossier") to deflect attention from Zea.

fff. On or about August 21, 2019, Stockwell created the document that Baugh requested—"Bay Area POIs_August 2019.docx"—and emailed it to Popp and Baugh, who forwarded it to Gilbert for use in the NPD meeting.

ggg. On or about August 22, 2019, Gilbert and another eBay employee met with three NPD officers at the NPD. During the meeting, Gilbert falsely stated that:

- Zea and Harville had come to Boston to attend a conference;
- Popp was Zea's supervisor; and
- Popp had assigned Zea to a Person of Interest investigation regarding the Steiners, and that Zea had driven to Natick "on her own."

hhh. On or about August 22, 2019, after the NPD meeting, Popp used one of the new Twitter accounts to post "@[Newsletter] 20 yrs of lies n distroin familys... dunt b proud of dat u wurthless BITCH!!! i wil distroy ur family n bizness 2... C how u like it...\n\n@Elei_Tui wen r we goin 2 visit her in natik???"

iii. On or about August 23, 2019, Harville falsely told eBay investigators that he had traveled to Boston to attend a conference, he had not been in Natick, and he had not had any interaction with the Steiners or the NPD.

jjj. On or about August 23, 2019, Baugh falsely told eBay investigators his team was not responsible for harassing messages or deliveries and that his team had been in Natick to investigate threats to the Steiners.

kkk. On August 23, 2019, at 5:15 p.m. (PDT), Baugh messaged Executive 2 as follows:

Hi [Executive 2] – this is Jim Baugh's personal cell. My team ran an Op on our friend in Boston. Nothing illegal occurred and we were actually intending to team up with her and get her on our side in a positive manner. However, small town police got a couple of rental car plates and tracked it back to my people and the hotel the were staying at. They sent a note to ebay investigations GAP team who then passed it to legal and they are conducting an internal investigation on us. We are cooperating, but I know they realize something is off. We will continue to cooperate, but not sure how much longer we can keep this up. If there is any way to get some top cover that would be great. If not, I just wanted you to have a heads up because they are aware that multiple members of the ELT are not a fan of that website to include [redacted] and his wife. Again, no crime was committed and

local police don't have a case. I don't want our legal team to give them one. Let me know if you want to discuss this weekend.

lll. On or about August 26, 2019, Harville falsely told eBay investigators that he didn't know whether Zea had gone to Natick and that he had not worked on a matter involving the Steiners.

mmm. On or after August 26, 2019, Baugh, Harville, Popp, Zea, Gilbert, and others deleted and attempted to delete data from their mobile phones that evidenced the conspiracy, including WhatsApp messages.

nnn. On or about August 27, 2019, Harville falsely told eBay investigators that he had attended a conference in Boston with Zea.

ooo. On or about August 28, 2019, Baugh falsely told eBay investigators that his team was not responsible for the deliveries or harassing communications.

ppp. On or about August 30, 2019, Baugh directed an eBay employee to retrieve computers from the GIC and to bring them to his house.

qqq. On or about August 30, 2019, after receiving an email from an eBay investigator directing him to preserve relevant information and to turn in his eBay-issued cell phone, Harville messaged Baugh, Gilbert, and Popp, "Want me to wipe it."

rrr. On or about August 30, 2019, Harville turned in his eBay-issued cell phone from which significant data related to his trip to Natick had been deleted.

sss. On or about September 6, 2019, Popp posted five new Tweets to one of the Twitter accounts that the Individual Defendants had used to harass the Steiners, to suggest that those responsible for harassing the Steiners were still at large.

<u>Executive 2's Receipt of Information Regarding the Harassment and Intimidation Campaign</u>

53. On or about August 20, 2019, an NPD detective emailed eBay to request assistance with the NPD's investigation into the harassment of the Steiners.

54. On or about August 21, 2019, at approximately 2:49 p.m. (PDT), an eBay communications employee forwarded to Executive 2, who was traveling overseas, an email containing the NPD request, underneath an "exploding head" emoji.

55. At approximately 3:05 p.m. (PDT), Executive 2 responded, "Please do not do anything until I can check a few things…I don't want us to engage. Who specifically did the local police contact first at eBay."

56. On or about August 22, 2019, eBay's General Counsel emailed Executive 2, Executive 3, and another eBay executive, informing them that the Steiners had contacted the NPD about being harassed, and that eBay would be beginning an internal investigation immediately ("the GC Email"). The GC Email enclosed a copy of a second NPD request to eBay for assistance in the investigation that identified Harville and Zea's possible involvement in the harassment.

57. On or about August 23, 2019, at approximately 5:15 p.m. (PDT), Baugh messaged Executive 2 as follows:

> Hi [Executive 2] – this is Jim Baugh's personal cell. My team ran an Op on our friend in Boston. Nothing illegal occurred and we were actually intending to team up with her and get her on our side in a positive manner. However, small town police got a couple of rental car plates and tracked it back to my people and the hotel the were staying at. They sent a note to ebay investigations GAP team who then passed it to legal and they are conducting an internal investigation on us. We are cooperating, but I know they realize something is off. We will continue to cooperate, but not sure how much longer we can keep this up. If there is any way to get some top cover that would be great. If not, I just wanted you to have a heads up because they are aware that multiple members of the ELT are not a fan of that website to include [redacted] and his wife. Again, no crime was committed and local police don't have a case. I don't want our legal team to give them one. Let me know if you want to discuss this weekend.

58. On or about August 23, 2019, at approximately 5:24 p.m. (PDT), Executive 2 and Baugh spoke by phone for approximately 10 minutes.

59. On or about August 27, 2019 and August 28, 2019, eBay investigators interviewed Executive 2 regarding the harassment and intimidation of the Steiners.

60. On or about August 30, 2019, eBay investigators obtained forensic copies of Executive 2's eBay-issued and personal cell phones.

61. Executive 2's cell phones did not contain the message from Baugh described in paragraph 57 above or the other August 2019 messages between Baugh and Executive 2 regarding Ina Steiner and EcommerceBytes, indicating that those messages had, at some point, been deleted.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EBAY INC.,<br><br>Defendant | ) | Criminal No. 24-10003<br><br>Violations:<br><br>Counts One and Two: Stalking Through Interstate Travel<br>(18 U.S.C. § 2261A(1)(B))<br><br>Counts Three and Four: Stalking Through Facilities of Interstate Commerce<br>(18 U.S.C. § 2261A(2)(B))<br><br>Count Five: Tampering with a Witness<br>(18 U.S.C. § 1512(b)(3))<br><br>Count Six: Destruction, Alteration, and Fabrication of Records in a Federal Investigation<br>(18 U.S.C. § 1519) |

## INFORMATION

The United States Attorney charges:

### General Allegations

At all times relevant to this Information:

1. In 2019, the defendant, eBay Inc. ("eBay") was a multinational ecommerce business that operated marketplaces connecting online sellers and their customers. eBay was headquartered in San Jose, California.

2. Executive 1 was eBay's Chief Executive Officer.

3. Executive 2, who joined eBay in February 2019, was the Company's Chief Communications Officer.

4. Executive 3 was eBay's Senior Vice President for Global Operations.

5. Jim Baugh ("Baugh") was eBay's Senior Director of Safety & Security—an eBay division responsible for, in general terms, the physical security and reputation of eBay's employees and facilities worldwide. Baugh reported to Executive 3.

6. David Harville ("Harville"), who reported to Baugh, was eBay's Director of Global Resiliency, a unit focused on ensuring that eBay could continue to operate after business disruptions, such as security threats, political unrest, or natural disasters.

7. Stephanie Popp ("Popp") was eBay's Senior Manager of Global Intelligence and served as Baugh's de facto chief of staff. Before May 2019, Popp managed eBay's Global Intelligence Center ("GIC"), an intelligence and analytics group within the GSR that supported eBay's security operations.

8. Stephanie Stockwell ("Stockwell") was an intelligence analyst in the GIC who became its manager in mid-2019, when eBay promoted Popp.

9. Veronica Zea ("Zea") was an eBay contractor who worked as an intelligence analyst in the GIC.

10. Brian Gilbert ("Gilbert") and Philip Cooke ("Cooke") were retired Santa Clara, California police captains. Each worked at eBay and had responsibilities for, among other things, safety and security at eBay facilities, executive protection, and special events security.

*EcommerceBytes*

11. Ina and David Steiner were a married couple living in Natick, Massachusetts. The Steiners co-founded EcommerceBytes, a website that since 1999 had reported on ecommerce companies, including eBay. Ina Steiner was the editor and reporter for EcommerceBytes; David Steiner served as its publisher.

*Events Preceding the Harassment and Intimidation Campaign*

12. By the spring of 2019, EcommerceBytes' reporting was a source of frustration at eBay. Executive 2 suggested at various times that he wanted to "eff with" Ina Steiner or "blow her site up," and Executive 1 said, regarding the *Wall Street Journal*, "F[***] them. The journal is next on the list after I[n]a."

*Fidomaster*

13. By the spring of 2019, an anonymous internet user known variously as "Fidomaster", "Dan Davis", and "unsuckebay" (hereinafter "Fidomaster") had also become a source of frustration to Executive 1, Executive 2, Baugh, and others at eBay.

14. At Executive 2's direction, Baugh caused the GIC to prepare a report concerning Fidomaster. The March 2019 report concluded that Fidomaster was an "anonymous twitter user that posts negative content about eBay and its senior leadership." It also asserted that "Fidomaster" communicated with Ina Steiner about issues pertaining to eBay, noting "Steiner and eCommerceBytes are known for publishing negative content about eBay and its executives."

15. In approximately April or May 2019, Baugh met with GIC employees and told them the GIC would be writing an anonymous, handwritten, and threatening letter to Ina Steiner, to get her to stop publishing articles critical of eBay. The letter was never sent.

*Walker's West*

16. On or about May 21, 2019, EcommerceBytes published an article entitled, "*Did You Know eBay Built a Lavish NYC Pub-Style Lounge*?" The article reported that Executive 1 had commissioned the construction of a pub—Walker's West—on eBay's corporate campus, modelling it after a New York City bar. The article contained links to a contractor's website, which featured pictures of the project and a description of the pub.

17. Baugh alerted Executive 3 to the article by email that night, with the subject "Fwd: Ina Steiner – Walker's West."

18. Within hours, Executive 2 contacted a public relations consultant about the Walker's West article. Executive 2 wrote: "I'm just no longer accepting 'ignore' as a broader strategy and want to fight back. Look forward to talking ASAP to get your assessment of how to do that most [e]ffectively."

19. Thereafter, eBay communications employees sent information to the consultant about the Steiners, including their buying-selling history on eBay and the perspectives of eBay employees who knew them.

20. On or about May 31, 2019, Executive 2 and Executive 3 exchanged messages regarding Ina Steiner and EcommerceBytes. In relevant part:

a. Executive 2 described an EcommerceBytes article discussing Executive 1's presentation to shareholders during eBay's 2019 annual meeting as "[s]hockingly reasonable";

b. Executive 3 referred to Ina Steiner as a "cow";

c. Executive 2 responded, "Her day is coming…"

d. Executive 3 stated, "I can't wait. // Jim Baugh came to me with some thoughts and I told him to stand down and leave it alone."

e. Executive 2 responded, "You are being too kind… tell him to be my advisor on this issue // Some times you just need to make an example out of someone. Justice // We are too nice. She needs to be crushed"

f. Executive 3 responded, "I told [Baugh] I would raise to you and you would let him know if you want him to proceed – but knew you were working on something and didn't want to step into that."

g. Executive 2 responded with a "thumbs up" emoji.

21. On or about June 6, 2019, Baugh tasked the GIC with tracking all of Ina Steiner's and EcommerceBytes' articles and social media posts concerning eBay.

22. On or about June 7, 2019, beneath the letters "FYSA" [For Your Situational Awareness], Executive 2 forwarded to Baugh the emails about the Steiners that eBay had shared with the public relations consultant.

23. On or about June 7, 2019, at Baugh's direction, Gilbert (the retired police captain) traveled to the Boston area to surveil the Steiners.

24. On or about June 8, 2019, Baugh called the Steiners' home in the middle of the night and hung up without speaking to them.

25. On or about June 8, 2019, Gilbert went to the Steiners' home in Natick and scrawled the name "Fidomaster" on their fence.

26. On or about June 17, 2019, the consultant proposed steps to reduce the Steiners' and EcommerceBytes' impact on eBay. The consultant recommended that eBay either (1) create or promote company-friendly content that would drive EcommerceBytes' posts lower in search

engine results; or (2) terminate the Steiners' eBay accounts for violations of the company's Terms of Use. Neither proposal was adopted.

27. On or about June 25, 2019, Executive 2 messaged two eBay communications employees about an EcommerceBytes article comparing eBay and another ecommerce company. After observing that he could not "complain about [Ina Steiner] pointing out fair bumps in our road", Executive 2 stated: "Love it when a secret, we can't speak it out loud plan comes together... 👁", and added, "We always reserve the right to go 0-60 and get crazy on her ass, but this is a huge adjustment the last month. Ever since the Walker's post... 😉".

*The Harassment and Intimidation Campaign*

28. On or about August 1, 2019, the *New York Times* reported that eBay had accused Amazon in a lawsuit of unlawfully poaching eBay sellers to Amazon's online marketplace.

29. That day, at approximately 1:46 p.m. (EDT), Ina Steiner posted an article on EcommerceBytes under the headline, "eBay RICO Lawsuit Meant to Curb Seller Exodus to Amazon?" She wrote: "[Executive] 1 has been unable to stop a decline in market sales, but trying to dissuade sellers from turning to Amazon (and trying to get Amazon to stop recruiting sellers) may not be the best tactic."

30. At approximately 2:19 p.m. (EDT), Executive 1 texted Executive 2: "Ina is out with a hot piece on the litigation. If we are ever going to take her down..now is the time."

31. Executive 2 responded at approximately 2:36 p.m. (EDT): "On it."

32. As set forth below, a series of text messages followed between Executive 2 and Baugh, beginning with Executive 2's passing along of Executive 1's suggestion that "we … take her down":




33. Executive 2 and Baugh's August 1, 2019 conversation continued by text, with Baugh committing to put in motion a "plan B" and Executive 2 committing to "embrace managing any bad fall out."




34. Baugh continued, stating falsely that Fidomaster—whom he referred to as the "unsuck idiot"—was David Steiner "or [an]other close associate" of Ina Steiner's:




35. Baugh concluded the August 1 exchange with Executive 2 as follows:




36. On or about August 6, 2019, an eBay seller contacted Executive 1 to complain about @unsuckebay, one of the Twitter accounts controlled by Fidomaster. The seller's complaint led Executive 2, Executive 1, Baugh, and eBay's general counsel to communicate about eBay's unsuccessful efforts to have the Twitter account shut down.

37. Executive 2's email concluded: "I am utterly vexed by this! This twitter account [Fidomaster] dominates our social narrative with his CONSTANT obsession with trolling us. It's more than annoying, it's very damaging."

38. The email noted that Fidomaster and "the eCom[m]ercebytes gal"—a reference to Ina Steiner—were "infatuated with eBay" and "have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand—or even build a business." It continued, "This issue gives me ulcers, harms employee moral, and trickles into everything about our brand. I

genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored. Somewhere, at some point, someone chose to let this slide. It has grown to a point that is absolutely unacceptable. It's the 'blind eye toward graffiti that turns into mayhem' syndrome and I'm sick about it. Whatever. It. Takes."

39. On or about August 7, 2019, at 4:59 p.m. (PDT), Baugh asked Executive 2 by message, "If I can neutralize Ina's website in two weeks or less, does that work for you?" Within minutes, Executive 2 responded: "I want to see ashes. As long as it takes. Whatever it takes."

40. After receiving Executive 2's text messages and emails about the Steiners, EcommerceBytes, and Fidomaster, Baugh shared them with, among others, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea.

41. Beginning on or about August 5, 2019 and continuing through at least September 6, 2019, Baugh, Harville, Gilbert, Cooke, Popp, Stockwell, and Zea (together "the Individual Defendants") worked together to harass and intimidate the Steiners, and to place them under surveillance with the intent to harass and intimidate them, through repeated and hostile Twitter messages, deliveries of unwanted—and in some instances disturbing—items to the Steiners' home, and travel to Massachusetts to conduct physical surveillance. The Individual Defendants' conduct caused, attempted to cause, and would reasonably have been expected to cause substantial emotional distress to the Steiners.

42. The purposes of the harassment campaign were, among other things, to distract the Steiners from publishing EcommerceBytes, to alter the website's coverage of eBay, and to gather information that the Individual Defendants could use to discredit the Steiners and EcommerceBytes.

43. The Individual Defendants took steps to conceal their harassment campaign from eBay investigators and state and federal authorities, by, among other things, using non-eBay electronic communications platforms, billing expenses related to the campaign to an outside contractor, monitoring law enforcement communications, forging records, lying to investigators, and destroying evidence.

44. Among the manner and means by which Individual Defendants carried out the harassment campaign were the following:

a. Creating Twitter accounts in false names that featured ominous profile photos.

b. Using these Twitter accounts to send threatening private direct messages ("DMs") to Ina Steiner about her, David Steiner, and EcommerceBytes.

c. Publicly posting the Steiners' home address on Twitter, while suggesting in threatening messages that eBay sellers who were angry about EcommcerceBytes' coverage were going to visit the Steiners' home.

d. Ordering unwanted and scary items and services to the Steiners' home, and ordering items intended to embarrass the Steiners to their neighbors' addresses.

e. Posting online advertisements for fictitious events at the Steiners' home, including sexual encounters, to encourage strangers to visit them there.

f. Traveling to Natick to install a GPS device on the Steiners' car, and to surveil the Steiners in their home and in their community.

g. Monitoring law enforcement communications to avoid detection.

h. Establishing false cover stories for the surveillance trip, including that the coconspirators were investigating the Steiners for threatening Executive 1.

i. Continuing surveillance, even after the Steiners had detected it, with the purpose of intimidating them.

j. Disguising their roles in the conspiracy by harassing and intimidating the Steiners using prepaid cell phones and laptops, VPN services, overseas email accounts, and prepaid debit cards purchased with cash.

k. Offering the Steiners assistance with the very harassment they were committing, to earn the Steiners' good will ("the White Knight Strategy").

l. Making false and misleading statements to NPD personnel who were investigating the threatening communications, harassing deliveries, and surveillance of the Steiners.

m. Communicating by WhatsApp regarding how to harass the Steiners and how to respond to the NPD investigation.

n. Creating a "dossier" of their own threats to the Steiners, which they planned to show to the NPD as proof that Zea and Harville were in Massachusetts investigating the harassment of the Steiners (purportedly by third parties).

o. Exchanging ideas about how best to thwart the NPD investigation, including creating false suspects, continuing the harassing deliveries, fabricating cover stories, and intervening with any San Jose area police that the NPD contacted to further its investigation.

p. Lying to eBay investigators who were responding to NPD requests for eBay's assistance.

q. Exchanging ideas about how best to thwart eBay's internal investigation.

r. Deleting the contents of computers, cell phones, and social media accounts that evidenced the harassment and intimidation campaign and the defendants' and their coconspirators' efforts to obstruct the NPD investigation.

<u>Actions in Furtherance of the Harassment and Intimidation Campaign</u>

45. From on or about August 5, 2019 through at least September 6, 2019, the Individual Defendants took the following steps, among others, as part of the harassment and intimidation campaign:

a. On or about August 6, 2019, Baugh, Gilbert, Cooke, and Popp met at eBay headquarters to plan the White Knight Strategy.

b. On or about August 6, 2019, Baugh, Popp, Stockwell, Zea, and other members of the GIC met at eBay headquarters to plan the delivery to the Steiners' home of unwanted and disturbing items to distract the Steiners from publishing the

Newsletter.

c. On or about August 6, 2019, Stockwell purchased a laptop computer at a Best Buy store in San Jose, California for use in the harassment and intimidation campaign.

d. On or about August 6, 2019, Popp created a Twitter account in the name of "@Tui_Elei" that used a picture of a skeleton mask as a profile picture.

e. On or about August 7, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "[Ina Steiner's First Name]…whats your problem w/ebay? You know that's how we pay rent."
- "HELLO!!!!!!!"

f. On or about August 8, 2019, Zea and a GIC analyst purchased prepaid debit cards with cash at a Santa Clara, California supermarket for use in ordering harassing deliveries to be sent to Victims 1 and 2.

g. On or about August 9, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "WTF…whats it goin to take for u to answer me??"
- "I guess im goin to have to get ur attention another way bitch…"
- "U don't have the balls to talk to me?? Stop hiding behind ur computer screen u fuckin cunt!!!"

h. On or about August 9, 2019, Stockwell used an anonymous email account to order live spiders and fly larvae for delivery to the Steiners' home.

i. On or about August 9, 2019, one or more of the Individual Defendants ordered a subscription for pornographic magazines in the name of David Steiner to be sent to the Steiners' neighbors.

j. On or about August 9, 2019, one or more of the Individual Defendants attempted to order a pig fetus for delivery to the Steiners' home.

k. On or about August 10, 2019, one or more of the Individual Defendants ordered a Halloween Pig Mask for delivery to the Steiners' home.

l. On or about August 10, 2019, Popp sent the following DM from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "DO I HAVE UR ATTENTION NOW????"

m. On or about August 10, 2019, Popp sent the following DMs from the @Tui_Elei Twitter account to Ina Steiner's Twitter account:

- "Ur fat fuck pussy husband [David Steiner's first name] needs to put u in line cunt."
- "after he takes the plugs out of his asshole…fuckin pussies!!!"

n. On or about August 11, 2019, Baugh directed Harville to travel with him to Boston for an "op" targeting Ina Steiner and her website (*i.e.*, EcommerceBytes).

o. On or about August 11, 2019, Baugh sent Harville the following text message: "I won't send the bosses texts, but I've been ordered to find and destroy." Harville replied, "Copy. Totally black[.] I'm deleting this now."

p. On or about August 12, 2019, Baugh sent Popp, Stockwell, Zea, and other GIC analysts the following WhatsApp message: "Starting now through Tuesday night double our effort on everything. Spam, house deliveries, etc. I don't want anything delivered on Thursday, so the cutoff should be Wednesday night – wake them up with a limo driver or something and then everything goes cold Thursday morning. … Take down all Craigslist posts late Wednesday night. Stop spam late Wednesday night, etc."

q. On or about August 12, 2019, one or more of the Individual Defendants sent a book titled "Grief Diaries: Surviving Loss of a Spouse" to the Steiners' home.

r. On or about August 12, 2019, Popp used the @Tui_Elei Twitter account to post publicly to Ina Steiner's Twitter account: "[Ina Steiner]…wats ur problem with ebay??"

s. On or about August 12, 2019, Popp used the @Tui_Elei Twitter account to post publicly to Ina Steiner's Twitter account: "many familys including mine make money 2 pay 4 food cloths and rent by selling on ebay…UR stupid idkiot comments r pushin buyers away from ebay and hurtin familys!!! STOP IT NOW!!"

t. On or about August 13, 2019, one or more of the Individual Defendants used a prepaid debit card to order a funeral wreath for delivery to the Steiners' home.

u. On or about August 14, 2019, one or more of the Individual Defendants ordered live cockroaches for delivery to the Steiners' home.

v. On or about August 14, 2019, Popp used the @Tui_Elei Twitter account to post a public message to Ina Steiner's Twitter account: "[First name of Ina Steiner] wen u hurt our bizness u hurt our familiys…Ppl will do ANYTHING 2 protect family!!!!"

w. On or about August 14, 2019, Baugh, Harville, Zea, Gilbert, and Popp met to discuss a trip to Natick, Massachusetts to install a GPS tracking device on the Steiners' car and to surveil the Steiners. At the meeting, Baugh instructed Zea to stop harassing deliveries that would interfere with the surveillance operation.

x. On or about August 14, 2019, Zea attempted to register herself and Harville for a software development conference in Boston as false cover for the surveillance trip.

y. On or about August 15, 2019, Harville used his eBay-issued phone to visit a website that could be used to monitor the "Natick Police and Fire Live Audio Feed."

z. On or about August 15, 2019, Baugh, Harville, and Zea flew from California to Boston, Massachusetts.

aa. On or about August 15, 2019, Stockwell sent a text message to Harville providing the license plate numbers for the Steiners' cars.

bb. On or about August 15, 2019, Baugh, Harville, and Zea drove to the Steiners' home in Natick and attempted unsuccessfully to install a GPS tracking device on the Steiners' car, which was locked in the Steiners' garage.

cc. On or about August 15, 2019, Baugh, Harville, Popp, and Zea dialed in to a conference line to communicate during the surveillance operation and to monitor the NPD dispatch.

dd. On or about August 15, 2019, Baugh directed Stockwell by WhatsApp message to prepare an eBay "Person of Interest" report ("POI Report") that listed the Steiners as eBay's top POIs. Baugh wrote, "In the narrative I need you to write that they have made direct threats to ebay, [eBay's CEO], and our employees (make it up)."

ee. On or about August 16, 2019, Harville purchased tools at a Boston hardware store for the purpose of breaking into the Steiners' locked garage.

ff. On or about August 16, 2019, Baugh, Harville, and Zea returned to Natick in a rented Dodge Caravan to surveil the Steiners, and drove past their home repeatedly.

gg. On or about August 16, 2019, Harville dialed in to the surveillance team's conference line.

hh. On or about August 16, 2019, Baugh, Harville, and Zea followed David Steiner as he drove around Natick.

ii. On or about August 16, 2019, believing that David Steiner had spotted the surveillance, Baugh returned the Dodge Caravan to the rental car agency.

jj. On or about August 16, 2019, after the failed surveillance, Baugh directed that harassing deliveries to the Steiners resume.

kk. On or about August 17, 2019, at 3:08 a.m. (EDT), Stockwell researched Boston-area 24-hour drain repair services on the internet for the purpose of sending a repairman to the Steiners' home in the middle of the night.

ll. On or about August 17, 2019, one or more of the Individual Defendants ordered pizza to be delivered to the Steiners' home at 4:30 a.m., for payment upon delivery.

mm. On or about August 17, 2019, Harville returned to California, and Popp traveled to Boston to replace him on the surveillance team.

nn. On or about August 18, 2019, Popp replied to a public tweet on Ina Steiner's Twitter account using the @Tui_Elei account and stated: "Dis ur address???" The message was followed by information about Ina Steiner, accurately stating her name, age, address, and telephone number.

oo. On or about August 18, 2019, Popp sent the following DM from the @Tui_Elei Twitter account to Ina Steiner's Twitter account: "U get my gifts cunt!!??"

pp. On or about August 18, 2019, one or more of the Individual Defendants posted an advertisement on Craigslist claiming to be a married couple seeking a sexual partner or partners, and providing the Steiners' home address.

qq. On or about August 18, 2019, Baugh, Popp, and Zea followed David Steiner as he drove in Natick.

rr. On or about August 20, 2019, Baugh sent a text message to Popp, Gilbert, and Cooke that the Individual Defendants had "burned" two surveillance cars and that either the Steiners or the NPD were "seeing ghosts right now."

ss. On or about August 20, 2019, Baugh forwarded to Gilbert the POI Report falsely indicating that the Steiners were security threats to eBay. In a WhatsApp message to Gilbert, Cooke, and Popp, Baugh stated: "Just sent poi doc with [the Steiners] included. I had GIC send this to me last week in case we got stopped..that way would at least have something to show to PD."

tt. On or about August 20, 2019, after Twitter suspended the @Tui_Elei account for posting the Steiners' home address, Popp created a new Twitter account, @Elei_Tui, for use in harassing the Steiners.

uu. On or about August 20, 2019, Popp also created two other Twitter accounts, including one that used the name of a prominent eBay seller.

vv. On or about August 21, 2019, Zea and Baugh made false statements to an NPD detective who came to the surveillance team's hotel to investigate Zea and Harville's connection to the cyberstalking campaign.

ww. On or about August 21, 2019, at approximately 9:36 a.m. (EDT), Baugh sent the following text message to Popp, Gilbert, and Cooke: "Natick detective is in lobby looking for [Zea]. I've taken her away from hotel headed to airport...Detective called her cell. I answered just now as her husband and played dumb."

xx. On or about August 21, 2019, at approximately 9:39 a.m. (EDT), Gilbert proposed to Baugh, Cooke, and Popp bringing "dossiers" on the Steiners to the NPD: "Definitely want to make them look crazy."

yy. On or about August 21, 2019, between approximately 10:30 a.m. and 12:00 p.m. (EDT), Popp sent more threatening tweets to and about Ina Steiner and the Newsletter ("the Concerning Tweets"). Popp used the three Twitter accounts that she had created the night before to have a public "conversation" on Twitter, asking over one account what Ina Steiner's address was, and responding from the other "guest I hav to pay Ina a visit."

zz. On or about August 21, 2019, minutes after writing the Concerning Tweets, Popp forwarded images of the Concerning Tweets to Baugh and Gilbert, writing falsely that Ina Steiner was "really bringing out some angry Twitter users."

aaa. On or about August 21, 2019, at approximately 12:34 p.m. (EDT), Baugh forwarded the Concerning Tweets to Harville.

bbb. On or about August 21, 2019, at approximately 2:30 p.m. (EDT), executing the White Knight Strategy, Gilbert called the Steiners, identified himself as an eBay employee, and offered eBay's assistance.

ccc. After the call, Gilbert messaged Baugh, Popp, and Cooke that the Steiners were "totally rattled."

ddd. Thereafter, still on August 21, 2019, Gilbert spoke, text messaged, and emailed with an NPD detective who was handling the investigation into the harassment of the Steiners. Gilbert falsely claimed not to know Zea or Harville and falsely stated that he had to travel to Toronto and New York but would instead attempt to come to Boston to meet with the NPD.

eee. On or about August 21, 2019, after learning that the NPD was investigating the use of a prepaid debit card to purchase pizzas for delivery to the Steiners, Baugh and Popp directed Stockwell to prepare a list of eBay "Persons of Interest" in the San Francisco Bay Area that could be used (as part of Gilbert's "dossier") to deflect attention from Zea.

fff. On or about August 21, 2019, Stockwell created the document that Baugh requested—"Bay Area POIs_August 2019.docx"—and emailed it to Popp and Baugh, who forwarded it to Gilbert for use in the NPD meeting.

ggg. On or about August 22, 2019, Gilbert and another eBay employee met with three NPD officers at the NPD. During the meeting, Gilbert falsely stated that:

- Zea and Harville had come to Boston to attend a conference;
- Popp was Zea's supervisor; and
- Popp had assigned Zea to a Person of Interest investigation regarding the Steiners, and that Zea had driven to Natick "on her own."

hhh. On or about August 22, 2019, after the NPD meeting, Popp used one of the new Twitter accounts to post "@[Newsletter] 20 yrs of lies n distroin familys... dunt b

proud of dat u wurthless BITCH!!! i wil distroy ur family n bizness 2... C how u like it...\n\n@Elei_Tui wen r we goin 2 visit her in natik???"

iii. On or about August 23, 2019, Harville falsely told eBay investigators that he had traveled to Boston to attend a conference, he had not been in Natick, and he had not had any interaction with the Steiners or the NPD.

jjj. On or about August 23, 2019, Baugh falsely told eBay investigators his team was not responsible for harassing messages or deliveries and that his team had been in Natick to investigate threats to the Steiners.

kkk. On August 23, 2019, at 5:15 p.m. (PDT), Baugh messaged Executive 2 as follows:

> Hi [Executive 2] – this is Jim Baugh's personal cell. My team ran an Op on our friend in Boston. Nothing illegal occurred and we were actually intending to team up with her and get her on our side in a positive manner. However, small town police got a couple of rental car plates and tracked it back to my people and the hotel the were staying at. They sent a note to ebay investigations GAP team who then passed it to legal and they are conducting an internal investigation on us. We are cooperating, but I know they realize something is off. We will continue to cooperate, but not sure how much longer we can keep this up. If there is any way to get some top cover that would be great. If not, I just wanted you to have a heads up because they are aware that multiple members of the ELT are not a fan of that website to include [redacted] and his wife. Again, no crime was committed and local police don't have a case. I don't want our legal team to give them one. Let me know if you want to discuss this weekend.

lll. On or about August 26, 2019, Harville falsely told eBay investigators that he didn't know whether Zea had gone to Natick and that he had not worked on a matter involving the Steiners.

mmm. On or after August 26, 2019, Baugh, Harville, Popp, Zea, Gilbert, and others deleted and attempted to delete data from their mobile phones that evidenced the conspiracy, including WhatsApp messages.

nnn. On or about August 27, 2019, Harville falsely told eBay investigators that he had attended a conference in Boston with Zea.

ooo. On or about August 28, 2019, Baugh falsely told eBay investigators that his team was not responsible for the deliveries or harassing communications.

ppp. On or about August 30, 2019, Baugh directed an eBay employee to retrieve computers from the GIC and to bring them to his house.

qqq. On or about August 30, 2019, after receiving an email from an eBay investigator directing him to preserve relevant information and to turn in his eBay-issued cell phone, Harville messaged Baugh, Gilbert, and Popp, "Want me to wipe it."

rrr. On or about August 30, 2019, Harville turned in his eBay-issued cell phone from which significant data related to his trip to Natick had been deleted.

sss. On or about September 6, 2019, Popp posted five new Tweets to one of the Twitter accounts that the Individual Defendants had used to harass the Steiners, to suggest that those responsible for harassing the Steiners were still at large.

Executive 2's Receipt of Information Regarding the Harassment and Intimidation Campaign

46. On or about August 20, 2019, an NPD detective emailed eBay to request assistance with the NPD's investigation into the harassment of the Steiners.

47. On or about August 21, 2019, at approximately 2:49 p.m. (PDT), an eBay communications employee forwarded to Executive 2, who was traveling overseas, an email containing the NPD request, underneath an "exploding head" emoji.

48. At approximately 3:05 p.m. (PDT), Executive 2 responded, "Please do not do anything until I can check a few things…I don't want us to engage. Who specifically did the local police contact first at eBay."

49. On or about August 22, 2019, eBay's General Counsel emailed Executive 2, Executive 3, and another eBay executive, informing them that the Steiners had contacted the NPD about being harassed, and that eBay would be beginning an internal investigation immediately ("the GC Email"). The GC Email enclosed a copy of a second NPD request to eBay for assistance in the investigation that identified Harville and Zea's possible involvement in the harassment.

50. On or about August 23, 2019, at approximately 5:15 p.m. (PDT), Baugh messaged Executive 2 as follows:

> Hi [Executive 2] – this is Jim Baugh's personal cell. My team ran an Op on our friend in Boston. Nothing illegal occurred and we were actually intending to team up with her and get her on our side in a positive manner. However, small town police got a couple of rental car plates and tracked it back to my people and the hotel the were staying at. They sent a note to ebay investigations GAP team who then passed it to legal and they are conducting an internal investigation on us. We are cooperating, but I know they realize something is off. We will continue to cooperate, but not sure how much longer we can keep this up. If there is any way to get some top cover that would be great. If not, I just wanted you to have a heads up because they are aware that multiple members of the ELT are not a fan of that website to include DW and his wife. Again, no crime was committed and local police don't have a case. I don't want our legal team to give them one. Let me know if you want to discuss this weekend.

51. On or about August 23, 2019, at approximately 5:24 p.m. (PDT), Executive 2 and Baugh spoke by phone for approximately 10 minutes.

52. On or about August 27, 2019 and August 28, 2019, eBay investigators interviewed Executive 2 regarding the harassment and intimidation of the Steiners.

53. On or about August 30, 2019, eBay investigators obtained forensic copies of Executive 2's eBay-issued and personal cell phones. Executive 2's phones did not contain the message from Baugh described in paragraph 50 above or the other August 2019 messages between Baugh and Executive 2 regarding Ina Steiner and EcommerceBytes, indicating that those messages had, at some point, been deleted.

## COUNTS ONE AND TWO
Stalking Through Interstate Travel
(18 U.S.C. § 2261A(1)(B))

The United States Attorney further charges:

54. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 53 of this Information.

55. From on or about August 15, 2019 through on or about August 23, 2019, in the District of Massachusetts and elsewhere, the defendant,

eBay Inc.,

did travel in interstate commerce with the intent to harass, intimidate, and place under surveillance with intent to harass and intimidate another person, and in the course of, and as a result of, such travel engaged in conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to the persons described below:

| COUNT | VICTIM |
|---|---|
| 1 | Ina Steiner |
| 2 | David Steiner |

All in violation of 18 U.S.C. § 2261A(1)(B).

COUNTS THREE AND FOUR
Stalking Through Facilities of Interstate Commerce
(18 U.S.C. § 2261A(2)(B))

The United States Attorney further charges:

56. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 53 of this Information.

57. From on or about August 5, 2019 through August 23, 2019, in the District of Massachusetts and elsewhere, the defendant,

eBay Inc.,

did, with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate another person, use the mail, an interactive computer service, electronic communication service, electronic communications system of interstate commerce, and other facilities of interstate commerce to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to the persons described below:

| COUNT | VICTIM |
|---|---|
| 3 | Ina Steiner |
| 4 | David Steiner |

All in violation of 18 U.S.C. § 2261A(2)(B).

<u>COUNT FIVE</u>
Witness Tampering
(18 U.S.C. § 1512(b)(3) and 2)

The United States Attorney further charges:

58. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 53 of this Information.

59. From on or about August 20, 2019 through on or about August 30, 2019, in the District of Massachusetts and elsewhere, the defendant,

eBay Inc.,

did knowingly engage in misleading conduct toward the persons described below, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense, that is, the harassment and intimidation campaign charged in this Information.

| COUNT | OBJECT OF MISLEADING CONDUCT |
|---|---|
| 5 | NPD Detective |

All in violation of 18 U.S.C. § 1512(b)(3).

## COUNT SIX

Destruction, Alteration and Falsification of Records in a Federal Investigation
(18 U.S.C. § 1519)

The United States Attorney further charges:

60. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 53 of this Information.

61. On or about the dates set forth below, in the District of Massachusetts, the defendant,

eBay Inc.,

did knowingly alter, destroy, conceal and falsify the records, documents, and tangible objects below with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of any department and agency of the United States, that is, the harassment and intimidation campaign charged in this Information.

| COUNT | DATE | Record Destroyed or Falsified |
|---|---|---|
| 6 | August 21, 2019 | Bay Area POIs_August 2019.docx |

All in violation of 18 U.S.C. § 1519.

JOSHUA S. LEVY
ACTING UNITED STATES ATTORNEY

SETH KOSTO Digitally signed by SETH KOSTO Date: 2024.01.11 11:22:23 -05'00'

SETH B. KOSTO
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS
January 11, 2024